UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MASSACHUSETTS MUTUAL LIFE
INSURANCE COMPANY,

                          Plaintiff,

             - v -

BROADWAY 340 MADISON FEE LLC,
McCLOSKEY MECHANICAL CONTRACTORS
INC., REDLINE SHEET METAL INC., DONATO
PLUMBING INC., NOVA ELECTRIC LLC,
MATROS AUTOMATED ELECTRICAL
CONSTRUCTION, BO GUARDS
MECHANICALS LLC a.k.a. BO GUARDS
MECHANICAL LLC, CONSTRUCTION
RESOURCES CORP. OF NEW YORK, KING
ROSE OF NY INC., DNJ INDUSTRIES INC., and
JOHN DOE #1 through JOHN DOE #100, the last
one hundred names being fictitious and unknown to
Plaintiff, the persons or parties intended being the
tenants, occupants, persons, or corporations, if any,
having or claiming to have some interest in or lien
upon the premises described in the complaint,

                          Defendants.

Case No. 24-cv-3865


**COMPLAINT**

        Plaintiff Massachusetts Mutual Life Insurance Company, as Lender ("Lender"), by and

through its undersigned attorneys, Sheppard, Mullin, Richter & Hampton LLP, as and for its

Complaint against defendants, respectfully alleges as follows:

        1.      Lender brings this action to, among other things, foreclose on, seek certain

injunctive relief, and seek the appointment of a receiver in connection with (i) certain parcels of

commercial property located in the City of New York, County of New York, State of New York,

commonly known by the street address 340 Madison Avenue, New York, New York, with the

following tax map designations: Parcel A: Fee Parcel (Block 1278, Lots 15, 17, and Easterly Part

of Lot 14), Development Rights Parcel (Block 1278, Lot 8), Development Rights Parcel (Block 1280, Lot 1), Development Rights Parcel (Block 1278, Lots 62 and 63), Development Rights Parcel (Block 1278, Lot 65), Development Rights Parcel (Block 1278, Part of Lot 14); and Parcel B: Leasehold Parcel (Block 1278, Westerly Part of Lot 14, Upper Parcel), and (ii) certain other "Mortgaged Property" described in each Mortgage (as defined herein) (collectively, the "Property").

2.      The Property serves as security for a loan to defendant Broadway 340 Madison Fee LLC ("Borrower") in the original principal amount of $315,000,000, plus interest, late charges, attorneys' fees and costs and other amounts due under the Loan Documents (as defined herein) (the "Loan"), evidenced by certain notes, mortgages and other Loan Documents.

3.      Borrower has defaulted on the Loan, including but not limited to failing to pay the balance of the Loan on its maturity date (each such occurrence an "Event of Default," and together the "Events of Default"), which Events of Default have not been cured despite written notice to Borrower.  Accordingly, Lender seeks a judgment in the full amount of the Loan (inclusive of all principal, interest, late charges, attorneys' fees and costs and other amounts due under the Loan Documents), a judgment of foreclosure and sale to foreclose upon and sell the Property to pay off the Loan, a judgment against Borrower in connection with its personal liability as set forth in the Loan Documents, an order for Borrower to turn over all rents collected after the "Extended Maturity Date" (as defined herein), the appointment of a receiver, and certain injunctive relief.

## PARTIES

4.      Lender, as the holder and owner of the notes, mortgages, loan agreements, and other loan documents that are the subject of this action, is a Massachusetts corporation, with its

principal place of business at 1295 State Street, Springfield, Massachusetts, 01111.

5.      Upon information and belief, Borrower, the fee owner of the Property, is a Delaware limited liability company.  Borrower's sole member is Broadway 340 Madison Mezz LLC, a Delaware limited liability company.  The sole member of Broadway 340 Madison Mezz LLC is Broadway 340 Madison Junior Mezz LLC, a Delaware limited liability company.  The sole member of Broadway 340 Madison Junior Mezz LLC is 340 Madison Avenue JV LLC, a Delaware limited liability company.  USRC 340 Madison REIT II, a Maryland business trust, owns 59.31 percent of 340 Madison Avenue JV LLC and Broadway 340 Madison REIT, a Maryland business trust, owns the remaining 40.69 percent of 340 Madison Avenue JV LLC.  USRC 340 Madison REIT II is wholly owned by US RXR 340 LP, a Delaware limited partnership.  Broadway 340 Madison REIT is owned by Ontario Pension Board, a Canadian government agency located at 200 King Street West, Toronto, Ontario M5H 3X6, and ultimately by RXR Properties Holdings LLC, a Delaware limited liability company.  Affinius Capital LLC (formerly known as USAA Real Estate Company), a Delaware limited liability company, owns 68.605 percent of US RXR 340 LP, and RXR Fund II 340 Madison Co-Investor Holdings LP, a Delaware limited partnership, owns the remaining 31.395 percent of US RXR 340 LP.  Affinius Capital LLC is majority owned by Affinius Holdings LLC, a Delaware limited liability company.  A majority of Affinius Holdings LLC is owned by JFLC, LLC, a Delaware limited liability company.  The members of JFLC, LLC are James A. Davidson and Julia L. Davidson, who are both domiciled at 1832 Floribunda Avenue, Hillsborough, California 94010, and are therefore both citizens of California.  Fritz H. Wolff and Katherine E. Wolff are also both members of JFLC, LLC.  Fritz H. Wolff and Katherine E. Wolff are both domiciled at 7230 E. Coeur D'Alene Lake Drive, Coeur D'Alene, Idaho 83814, and are both therefore citizens of

Idaho.  The last member of JFLC, LLC is Leonard J. O'Donnell, who is domiciled at 322 W. Kings Hwy, San Antonio, Texas 78212.  Leonard J. Donnell is therefore a citizen of Texas. Accordingly, JFLC, LLC is a citizen of California, Idaho, and Texas.  FREP USA LP, a Delaware limited partnership, owns 70.999 percent of RXR Fund II 340 Madison Co-Investor Holdings LP.  RXR Fund II 340 Madison Investor LP, a Delaware limited partnership, owns 28.999 percent of RXR Fund II 340 Madison Co-Investor Holdings LP.  RXR Fund II 340 Madison Investor GP LLC, a Delaware limited liability company, owns the remaining .002 percent of RXR Fund II 340 Madison Co-Investor Holdings LP.  FREP USA LP's general partner is FREP USA GP LLC, which is located at 1100-10830 Jasper Avenue, Edmonton, AB T5J 2B3, Canada.  RXR Fund II 340 Madison Investor LP is owned by RXR Fund II 340 Madison Co-Investor II Holdings LP, a Delaware limited partnership, and by RXR 340 Madison Holdings LP, a Delaware limited partnership.  Ontario Pension Board, a Canadian government agency located at 200 King Street West, Toronto, Ontario M5H 3X6, owns 99.999 percent of RXR Fund II 340 Madison Co-Investor II Holdings LP.  RXR Fund II 340 Madison Investor GP LLC, a Delaware limited liability company, owns the remaining .001 percent of RXR Fund II 340 Madison Co-Investor II Holdings LP.  RXR Fund II 340 Madison Investor GP LLC is wholly owned by RXR Fund II GP LLC, a Delaware limited liability company.  RXR Fund II GP LLC is wholly owned by RXR Properties Holdings LLC, a Delaware limited liability company.  RXR Properties Holdings LLC is a wholly-owned subsidiary of RXR Realty LLC, a Delaware limited liability company.  The ownership of RXR Realty LLC is comprised of the following members: (i) Scott H. Rechler, (ii) James M. Maturo, (iii) NBSH Acquisition LLC, and (iv) Blue Owl Capital Inc.  Scott H. Rechler is domiciled at 58 Hoaglands Lanes, Glen Head, New York and is therefore a citizen of New York.  James M. Maturo is domiciled at 10 Split

Rock Lane, Syosset, New York and is therefore a citizen of New York.  NBSH Acquisition LLC is comprised of the following members:  Joseph V. Amato; George Herbert Walker, IV; Robert W. D'Alelio; and Heather Zuckerman.  Joseph V. Amato is domiciled at 64 Forest Way, Essex Fells, New Jersey 07021 and is therefore a citizen of New Jersey.  George Herbert Walker, IV is domiciled at 6 East 10th Street, New York, New York 10003 and is therefore a citizen of New York.  Robert W. D'Alelio is domiciled at 8231 Bay Colony Drive, Apt. 402, Naples, Florida 34108 and is therefore a citizen of Florida.  Heather Zuckerman is domiciled at 640 West End Avenue, Apt. 5A, New York, New York 10024 and is therefore a citizen of New York.  NBSH Acquisition LLC is therefore a citizen of New Jersey, New York, and Florida.  Blue Owl Capital, Inc. is a Delaware corporation with its principal place of business located at 399 Park Avenue, 38th Floor, New York, New York 10022.  RXR Realty is therefore a citizen of New York, New Jersey, Florida, and Delaware.   Accordingly, Borrower is a citizen of California; Delaware; Idaho; New Jersey; New York; Texas; and Toronto, Ontario.

6.     Upon information and belief, defendant McCloskey Mechanical Contractors Inc. ("McCloskey") is a Delaware corporation with its principal place of business located at 445 Lower Landing Road, Blackwood, New Jersey 08012.  McCloskey is named as a defendant herein because, upon information and belief, on or about June 22, 2023, it filed a notice of mechanic's lien against the Property in the amount of $185,167.80, which lien is subject and subordinate to the lien of the Mortgages.

7.     Upon information and belief, defendant Redline Sheet Metal Inc. ("Redline") is a New York corporation with its principal place of business located at 150 Marine Street, Farmingdale, New York 11735.  Redline is named as a defendant herein because, upon information and belief, on or about June 28, 2023, it filed a notice of mechanic's lien against the

Property in the amount of $30,804.65, which lien is subject and subordinate to the lien of the Mortgages.

8.     Upon information and belief, defendant Donato Plumbing Inc. ("Donato") is a New York corporation with its principal place of business located at 90 5th Avenue, Suite 1402, New York, New York 10036.  Donato is named as a defendant herein because, upon information and belief, on or about June 28, 2023, it filed a notice of mechanic's lien against the Property in the amount of $264,059.13, which lien is subject and subordinate to the lien of the Mortgages.

9.     Upon information and belief, defendant Nova Electric LLC ("Nova") is a New York limited liability company.  Nova is owned by Tatiyana Nicholson and Noel Nicholson. Tatiyana Nicholson and Noel Nicholson are both domiciled at 167 Fairmount Avenue, Chatham, New Jersey 07928, and are therefore both citizens of New Jersey.  Nova is named as a defendant herein because, upon information and belief, on or about February 26, 2024, it filed a notice of mechanic's lien against the Property in the amount of $197,277.27 (remaining balance $122,277.27), which lien is subject and subordinate to the lien of the Mortgages.

10.    Upon information and belief, defendant Matros Automated Electrical Construction ("Matros") is a New York corporation with its principal place of business located at 5-33 50th Avenue, Long Island City, New York 11101.  Matros is named as a defendant herein because, upon information and belief, on or about March 25, 2024, and March 27, 2024, it filed notices of mechanic's lien against the Property in the amounts of $98,949.00 and $1,523.20, respectively, which liens are subject and subordinate to the lien of the Mortgages.

11.    Upon information and belief, the defendant Bo Guards Mechanicals LLC, also known as Bo Guards Mechanical LLC ("Bo Guards"), is a New York limited liability company. Bo Guards is owned by Albert Sanders, Jr. and Lateecia Brooks.  Albert Sanders, Jr. and

Lateecia Brooks are both domiciled at 1481 Washington Avenue, Bronx, New York 10456, and are therefore both citizens of New York. Bo Guards is named as a defendant herein because, upon information and belief, on or about March 26, 2024, it filed a notice of mechanic's lien against the Property in the amount of $45,000.00, which lien is subject and subordinate to the lien of the Mortgages.

12.     Upon information and belief, defendant Construction Resources Corp. of New York ("Construction Resources") is a New York corporation with its principal place of business located at 221 Hunter Avenue, Staten Island, New York 10306. Construction Resources is named as a defendant herein because, upon information and belief, on or about April 3, 2024, it filed a notice of mechanic's lien against the Property in the amount of $70,947.00, which lien is subject and subordinate to the lien of the Mortgages.

13.     Upon information and belief, defendant King Rose of NY Inc. ("King Rose") is a New York corporation with its principal place of business located at 370 West 38th Street, Suite 1801, New York, New York 10018. King Rose is named as a defendant herein because, upon information and belief, on or about April 5, 2024, it filed a notice of mechanic's lien against the Property in the amount of $111,478.03, which lien is subject and subordinate to the lien of the Mortgages.

14.     Upon information and belief, defendant DNJ Industries Inc. ("DNJ", and together with McCloskey, Redline, Donato, Nova, Matros, Bo Guards, Construction Resources, and King Rose, the "Mechanic Lienors") is a New York corporation with its principal place of business located at 5505 Flushing Avenue, Maspeth, New York 11378. DNJ is named as a defendant herein because, upon information and belief, on or about April 12, 2024, it filed a notice of

- 7 -

mechanic's lien against the Property in the amount of $97,272.10, which lien is subject and subordinate to the lien of the Mortgages.

15.     Defendants John Doe #1 through John Doe #100 (fictitious names) are named as defendants herein to represent all other parties, including, without limitation, tenants, other occupants or lien holders, who may have some interest in or lien upon the Property, which interest or lien is subject and subordinate to the lien of the Mortgages.

## VENUE AND JURISDICTION

16.     This Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1332 because the amount in controversy is in excess of $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the parties.

17.     Venue is proper in this judicial district because Section 12.19 of the Loan Agreement, dated July 29, 2011, provides, in pertinent part, that any legal suit arising out of the Loan Agreement shall be instituted in any state or federal court in New York, New York.

## THE LOAN AND LOAN DOCUMENTS

18.     Borrower is the deed owner of the Property. The Property is a twenty-two-story commercial property with 745,312 rentable square feet of space.

19.     Lender and Borrower entered into a certain Loan Agreement dated as of July 29, 2011 (the "Initial Loan Agreement") relating to the Loan in the aggregate principal amount of $315,000,000.00, which loan is comprised of: (i) a term loan (evidenced by two promissory notes executed and delivered by Borrower to Lender) in the principal amount equal to $310,000,000.00 (the "Term Loan"); and (ii) a future advance loan (evidenced by a third promissory note executed and delivered by Borrower to Lender) in the aggregate principal amount not to exceed $5,000,000.00 (the "Future Advance Loan" and together with the Term

Loan, the "Loan").  A copy of the Initial Loan Agreement is annexed hereto as Exhibit 1, and its terms are incorporated herein by reference.

20.     Pursuant to the Initial Loan Agreement, the initial maturity date of the Loan was August 1, 2023 (the "Initial Maturity Date").

21.      Finally, pursuant to the Initial Loan Agreement, Borrower executed and delivered to Lender the other Loan Documents.

### A.     The Term Loan Notes and the Term Loan Mortgage

22.     The indebtedness of Borrower under the Term Loan is evidenced by the following two promissory notes executed and delivered by Borrower to Lender: (i) a certain Amended and Restated Promissory Note (Fixed Rate) dated as of July 29, 2011, in the principal amount of $305,000,000.00 (together with any amendments and/or modifications, "Note A"), and (ii) a certain Amended and Restated Promissory Note (Floating Rate) dated as of July 29, 2011, in the principal amount of $5,000,000.00 (together with any amendments and/or modifications, "Note B", and together with Note A, the "Term Loan Notes").  The Term Loan Notes are annexed hereto as Exhibits 2 and 3, respectively, and their terms are incorporated herein by reference.

23.     The Term Loan Notes amended and restated certain earlier notes, bonds, and other obligations (referred to as the "Original Notes" in the Term Loan Notes) and are intended to evidence the aggregate indebtedness of Borrower set forth in those Original Notes, which are in turn set forth in Schedule A attached to and made a part of the Term Loan Notes.  *See* Ex. 2 at Schedule A, *See* Ex. 3 at Schedule A.

24.     As security for the obligations under the Term Loan, Borrower, as mortgagor, executed, acknowledged, and delivered to Lender, as mortgagee, a certain Amended and Restated Fee and Leasehold Mortgage, Assignment of Leases and Rents, Security Agreement

and Fixture Filing dated as of July 29, 2011 (together with any amendments and/or modifications, the "Term Loan Mortgage"), pursuant to which Borrower, among other things, created a security interest in and mortgaged, warranted, granted, bargained, sold, conveyed, assigned, pledged, transferred and set over unto Lender, its successors and assigns, forever, with mortgage covenants and with all powers of sale and other statutory rights and covenants permitted under New York law, all of Borrower's right, title and interest in and to the Property (which is defined as the "Mortgaged Property" in the Term Loan Mortgage).[1]  The Term Loan Mortgage was recorded in the New York City Department of Finance Office of the City Register (the "City Register") on August 24, 2011 as CFRN 2011000299187, and the mortgage recording tax (to the extent required) was duly paid.  A copy of the Term Loan Mortgage is annexed hereto as Exhibit 4 and its terms are incorporated herein by reference.

     25.    The Term Loan Mortgage amended and restated in their entirety certain Existing Mortgages (as that term is defined in the Term Loan Mortgage) described in Schedule A attached thereto and made a part thereof, so that they would together form a single first mortgage lien on the Property for the full amount of the Term Loan, and said Existing Mortgages and the Original Notes secured thereby would be treated as if they were one mortgage and two promissory notes given to secure and to evidence the payment of the Term Loan.

     26.    Paragraph 2.03 of the Term Loan Mortgage also includes an irrevocable and unconditional assignment of all of the right, title and interest of Borrower in and to the "Leases",

---

[1] The Term Loan Mortgage defines the Property to include the "Land," "Improvements," "Appurtenances," "Premises," "Equipment," "Intangibles," "Air Space Lease," "Leases," "Property Income," "Proceeds," and other "Collateral" (as those terms are each defined in the Term Loan Mortgage).  *See* Ex. 4.

the "Property Income" and the "Air Space Interest" described in the Term Loan Mortgage (the "Term Loan Mortgage AL&R").

27.     Paragraph 3.01(a) of the Term Loan Mortgage also includes a security agreement and fixture filing within the meaning of the Uniform Commercial Code, which grants to Lender, as the holder of the Term Loan Mortgage a security interest in favor Lender with respect to, among other things, the Property that is covered by the Uniform Commercial Code, and such other property that may be subject to the Uniform Commercial Code (collectively, the "Term Loan Collateral").

28.     As further support for obligations under the Note A, Borrower, among other things, made, executed and delivered to Lender a certain Fee and Leasehold Assignment of Leases and Rents (Term Loan) dated as of July 29, 2011 (the "Term Loan AL&R").  The Term Loan AL&R was recorded in the City Register on August 24, 2011, as CFRN 2011000299188. A copy of the Term Loan AL&R is annexed hereto as Exhibit 5 and its terms are incorporated herein by reference.

29.     Pursuant to the Term Loan Mortgage AL&R and the Term Loan AL&R, Borrower, among other things, absolutely, presently and irrevocably assigned and transferred to Lender all of Borrower's right, title and interest in and to all leases, occupancy agreement, tenancies and other similar agreements affecting all or a portion of the Property.

30.     Further, pursuant to Term Loan Mortgage AL&R and the Term Loan AL&R, upon or at any time after the occurrence and during the continuance of an Event of Default, the revocable license granted to Borrower to collect and receive rents from tenants and occupants in connection with the Property shall be revoked upon written notice thereof to Borrower and without the need of any action by Lender, and Lender shall immediately be entitled to the receipt

and possession of all rents, proceeds or income arising from certain leases for the use and occupation of the Property.

31.     Relatedly, the Term Loan AL&R provides that, upon demand by the Lender while an Event of Default exists, the Borrower must deliver to Lender all rents in Borrower's possession and instruct Borrower's agent and lessees to pay rents directly to the Lender.

**B.     Future Advance Note and Future Advance Mortgage**

32.     The indebtedness of Borrower under the Loan Agreement for the Future Advance Loan is evidenced by a certain Future Advance Promissory Note dated as of July 29, 2011, in the principal amount of up to $5,000,000.00 or so much thereof as shall have been advanced from time to time (together with any amendments and/or modifications, "Note C" or the "Future Advance Note" and together with the Term Loan Notes, the "Notes").  A copy of the Future Advance Note is annexed hereto as Exhibit 6, and its terms are incorporated herein by reference.

33.     The Initial Loan Agreement allowed Borrower to request Lender to advance the Future Advance Loan in an amount up to $5,000,000.00 in minimum increments of $500,000.00, subject to certain terms and conditions set forth in the Initial Loan Agreement.

34.     As security for the obligations under the Future Advance Note, Borrower, as mortgagor, executed, acknowledged, and delivered to Lender, as mortgagee, a Fee and Leasehold Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of July 29, 2011 (together with any amendments and/or modifications, the "Future Advance Mortgage" and together with the Term Loan Mortgage, the "Mortgages"), pursuant to which Borrower, among other things, created a security interest in and mortgaged, warranted, granted, bargained, sold, conveyed, assigned, pledged, transferred and set over unto Lender, its successors and assigns, forever, with mortgage covenants and with all powers of sale and other

statutory rights and covenants permitted under New York law, all of Borrower's right, title and interest in and to the  Property (which is defined as the "Mortgaged Property" in the Future Advance Mortgage).[2] The Future Advance Mortgage was recorded in the City Register on January 7, 2013, as CFRN 2013000005348 and the mortgage recording tax (to the extent required) was duly paid.  A copy of the Future Advance Mortgage is annexed hereto as Exhibit 7 and its terms are incorporated herein by reference.

35.     Paragraph 2.03 of the Future Advance Mortgage also includes an irrevocable and unconditional assignment of all of the right, title and interest of Borrower in and to the "Leases", the "Property Income" and the "Air Space Interest" described in the Future Advance Mortgage (the "Future Advance Mortgage AL&R").

36.     Paragraph 3.01(a) of the Future Advance Mortgage also includes a security agreement and fixture filing within the meaning of the Uniform Commercial Code, which grants to Lender, as the holder of the Future Advance Mortgage a security interest in favor Lender with respect to, among other things, the Property that is covered by the Uniform Commercial Code, and such other property that may be subject to the Uniform Commercial Code (collectively, the "Term Loan Collateral", and together with the Term Loan Collateral, the "Collateral").

37.     As further support for the obligations under the Future Advance Loan, Borrower, among other things, made, executed and delivered to Lender a certain Fee and Leasehold Assignment of Leases and Rents (Future Advance Loan) dated as of July 29, 2011 (the "Future Advance AL&R," and together with the Term Loan AL&R, the "AL&Rs").   The Future

---

[2] The Future Advance Mortgage defines the Property to include the "Land," "Improvements," "Appurtenances," "Premises," "Equipment," "Intangibles," "Air Space Lease," "Leases," "Property Income," "Proceeds," and other "Collateral" (as those terms are each defined in the Future Advance Mortgage).  *See* Ex. 7.

Advance AL&R was recorded in the City Register on January 7, 2013, as CFRN 2013000005349.  A copy of the Future Advance AL&R is annexed hereto as <u>Exhibit 8</u> and its terms are incorporated herein by reference.

38.     Pursuant to the Future Advance Mortgage AL&R and the Future Advance AL&R, Borrower, among other things, absolutely, presently and irrevocably assigned and transferred to Lender all of Borrower's right, title and interest in and to all leases, occupancy agreement, tenancies and other similar agreements affecting all or a portion of the Property.

39.     Further, pursuant to the Future Advance Mortgage AL&R and the Future Advance AL&R, upon or at any time after the occurrence and during the continuance of an Event of Default, the revocable license granted to Borrower to collect and receive rents from tenants and occupants in connection with the Property shall be revoked upon written notice thereof to Borrower and without the need of any action by Lender, and Lender shall immediately be entitled to the receipt and possession of all rents, proceeds or income arising from certain leases for the use and occupation of the Property.

40.     The Future Advance AL&R further provides, upon demand by the Lender while an Event of Default exists, the Borrower must deliver to Lender all rents in Borrower's possession and instruct Borrower's agent and lessees to pay rents directly to the Lender.

C.     **The UCC Financing Statements**

41.     Lender perfected its first priority security interest in the Term Loan Collateral covered by the Uniform Commercial Code by publicly filing a UCC Financing Statement (the "<u>Term Loan UCC-1</u>") and recording the Term Loan Mortgage as a fixture filing, relating to any and all interests Borrower had or thereafter acquired in, among other things, the following collateral:  the "Land," "Improvements," "Appurtenances," "Premises," "Equipment,"

"Intangibles," "Air Space Lease," "Leases," "Property Income,"[3] and all proceeds, judgments, claims, compensation, awards of damages and settlements pertaining to or resulting from or in lieu of any condemnation or taking of the aforementioned collateral.  The Term Loan UCC-1 names Lender as the secured party and Borrower as the debtor.  The Term Loan UCC-1 was filed with the Delaware Secretary of State on August 22, 2011, as control number 20113446054.  A copy of the Term Loan UCC-1 is annexed hereto as <u>Exhibit 9</u> and its terms are incorporated herein by reference.

42.     Lender continued the effectiveness of the Term Loan UCC-1 by filing with the Delaware Secretary of State two Uniform Commercial Code Financing Statement Amendments on March 3, 2016 (control number 20161482662) and March 11, 2021 (control number 20211935833), respectively (collectively, the "<u>Term Loan UCC-1 Continuation Statements</u>"). As a result of the Term Loan UCC-1 Continuation Statements, Lender's security interest in the Term Loan Collateral is effective through August 22, 2026.  Copies of the Term Loan UCC-1 Continuation Statements are annexed hereto as <u>Exhibit 10</u> and their terms are incorporated herein by reference.

43.     Lender perfected its first priority security interest in the Future Advance Collateral by filing a UCC Financing Statement (the "<u>Future Advance UCC-1</u>") and recording the Future Advance Mortgage as a fixture filing,  relating to any and all interests Borrower had or thereafter acquired in, among other things, the following collateral: the "Land," "Improvements," "Appurtenances," "Premises," "Equipment," "Intangibles," "Air Space Lease,"

---

[3] The quoted terms used in this Paragraph are defined to have the same meaning ascribed to those terms in the Term Loan UCC-1.

"Leases," "Property Income,"[4] and all proceeds, judgments, claims, compensation, awards of damages and settlements pertaining to or resulting from or in lieu of any condemnation or taking of the aforementioned collateral.  The Future Advance UCC-1 names Lender as the secured party and Borrower as the debtor.  The Future Advance UCC-1 was filed with the Delaware Secretary of State on December 11, 2012, as control number 20124806362.  A copy of the Future Advance UCC-1 is annexed hereto as Exhibit 11 and its terms are incorporated herein by reference.

44.    Lender continued the effectiveness of the Future Advance UCC-1 by filing with the Delaware Secretary of State two Uniform Commercial Code Financing Statement Amendments on June 20, 2017 (control number 20174846418) and July 1, 2022 (control number 20222887304), respectively (collectively, the "Future Advance UCC-1 Continuation Statements").  As a result of the Future Advance UCC-1 Continuation Statements, Lender's security interest in the Future Advance Collateral is effective through December 11, 2027.  Copies of the Future Advance UCC-1 Continuation Statements are annexed hereto as Exhibit 12 and its terms are incorporated herein by reference.

**D.     First Amendment to the Loan Agreement**

45.    Borrower, as borrower, and Lender, as lender, entered into a certain First Amendment to Loan Agreement dated as of June 26, 2023 (the "First Amendment to Loan Agreement," together with the Initial Loan Agreement, the "Loan Agreement") to, among other things, extend the Initial Maturity Date for the Loan to February 1, 2024 (the "Extended Maturity Date"), and to modify certain other terms and provisions of the Initial Loan Agreement as set

---

[4] The quoted terms used in this Paragraph are defined to have the same meaning ascribed to those terms in the Future Advance UCC-1.

forth in the First Amendment to Loan Agreement. A copy of the First Amendment to Loan Agreement is annexed hereto as <u>Exhibit 13</u> and its terms are incorporated herein by reference.

**E. Lender is the Holder of the Subject Loan Documents**

46. Lender is the true and lawful owner and holder of all of the above described Loan Documents, including, but not limited to, the Loan Agreement, the Notes, the Mortgages, the AL&Rs, the Term Loan UCC-1, the Future Advance UCC-1, and all other documents included in the definition of the term "Loan Documents" in the Loan Agreement (collectively, the "<u>Loan Documents</u>"), and the indebtedness secured thereby.

**F. Borrower's Defaults of the Loan Documents**

47. Pursuant to the terms of the Loan Documents, Borrower covenanted and agreed to pay the Loan in accordance with the terms, conditions, and provisions of the Loan Agreement and the other Loan Documents, and to otherwise timely and fully perform or comply with all terms, obligations, covenants and/or conditions contained in the Loan Documents.

48. Specifically, Section 9.1(a) of the Loan Agreement provides that, among other things, Borrower's failure to pay the outstanding principal balance, all accrued and unpaid interest and any other amounts then due under the Loan Documents by the Extended Maturity Date constitutes an Event of Default.

49. Pursuant to the terms of the Loan Agreement, and in particular the First Amendment to Loan Agreement, the Loan matured on the Extended Maturity Date. Borrower failed to pay Lender the outstanding principal balance of the Loan, all accrued and unpaid interest, and all other amounts then due under the Loan Documents on or before the Extended Maturity Date. As a result, an Event of Default has occurred and continues to exist under the Loan Documents.

50.     Pursuant to Section 2.2(c) of the Loan Agreement, if Borrower fails to pay any monthly installment of principal or interest within five days following the date such amounts are due, Borrower must pay to Lender a late charge in the amount equal to 4% of such overdue amount.  Borrower owes to Lender such late charges (the "Late Charges") because Borrower failed to pay to Lender the installments of interest due under the Loan Documents on the Extended Maturity Date.  Borrower's failure to pay such Late Charges within 10 Business Days after notice from Lender constitutes an Event of Default under the Loan Documents.

51.     Further, pursuant to Section 2.2(d) of the Loan Agreement, upon an Event of Default or on the Extended Maturity Date, the unpaid principal balance of the Loan shall thereafter bear interest at the Default Rate (as defined in the Loan Agreement).  From and after the Extended Maturity Date, interest on the Loan has been accruing at the Default Rate and is immediately due and payable to Lender under Section 2.2(d) of the Loan Agreement.  Borrower failed to pay interest at the Default Rate from and after the Extended Maturity Date.  As a result, an Event of Default has occurred and continues to exist under the Loan Documents.

52.     Moreover, the Loan Agreement provides that Borrower's failure to pay certain other amounts and perform or comply with certain other terms, obligations, covenants or conditions as and when provided in the Loan Documents constitute Events of Default.

53.     Pursuant to Section 6.5 of the Loan Agreement, Borrower was obligated to pay when due all claims and demands of mechanics, materialmen and others which, if unpaid, might result in or permit the creation of a lien on the Property or any portion thereof, and was further obligated to cause the prompt, full and unconditional discharge of all liens imposed on or against the Property or any portion thereof.

54.     Additionally, pursuant to Section 8.1 of the Loan Agreement, liens (voluntary or involuntary) secured by any portion of the Property are not permitted except with the prior written consent of Lender.  Relatedly, Section 2.02 of each of the Mortgages prohibits Borrower from encumbering all or a portion of the Property, voluntarily or involuntarily, by operation of law, or otherwise.

55.     Borrower has failed to pay the claims and demands of the Mechanic Lienors that are secured by certain mechanic's liens on the Property or a portion thereof and has also failed to discharge such mechanic's liens in accordance with the terms of the Loan Documents. As a result, an Event of Default has occurred and continues to exist under the Loan Documents.

### G.     Lender's Remedies Upon Events of Default

56.     Pursuant to the Mortgages, upon the occurrence of an Event of Default (as defined in the Loan Agreement), Lender may, without notice and without regard to the adequacy of security, apply for the appointment of a receiver of the Property, which appointment Borrower consents to, whether or not a foreclosure sale has occurred.

57.     Moreover, the Loan Agreement provides that Borrower shall be personally liable to Lender, and Lender shall have full recourse against Borrower in connection with the Loan if and to the extent, among other things, Borrower applies or appropriates any rents received from tenants or other occupants of the Property in violation of the terms of the Loan Documents.

58.     The Loan Agreement further provides that Borrower shall pay or reimburse Lender on demand for all costs and expenses (including reasonable attorneys' fees, costs and expenses) incurred in enforcing the collection of the indebtedness set forth in the Loan Documents, any foreclosure of the Mortgages or any other of the Loan Document, or any enforcement of the Loan Documents in any judicial or receivership proceeding.

59.     As a result of the above Events of Default, Lender is permitted to exercise all rights and remedies under the Loan Documents and at law or in equity, including, without limitation, (i) commencing and prosecuting a foreclosure proceeding, (ii) applying for the appointment of a receiver of the Property whether or not a foreclosure sale has occurred, (iii) commencing and prosecuting a receiver-led sale of the Property, (iv) pursuing Borrower personally for any amounts in connection with Borrower's appropriation of any rents received from tenants or other occupants of the Property in violation of the terms of the Loan Documents, and (v) injunctive relief with respect to, among other things, any of the foregoing.

**H.     The Notices of Default**

60.     On or about February 5, 2024, Lender sent to Borrower a Notice of Default (the "February Notice of Default") based on, among other things, Borrower's failure to pay Lender the outstanding principal balance of the Loan, together with all accrued and unpaid interest, and all other amounts due under the Loan Documents on or prior to the Extended Maturity Date, which constitute an Event of Default under the Loan Documents.  A copy of the February Notice of Default is annexed hereto as Exhibit 14.

61.     Upon receipt by Borrower of the February Notice of Default, Lender was immediately entitled to the receipt and possession of all rents, proceeds or income arising from the Property.  However, Borrower has failed to pay Lender amounts in connection with all rents, proceeds or income arising from the Property.

62.     On or about May 10, 2024, Lender sent to Borrower an additional Notice of Default (the "Additional Notice of Default"), which, among other things, provided that the Events of Default remained uncured and demanded that Borrower immediately cure each of the Events of Default.  The Additional Notice of Default also provided that Lender, among other

things, has terminated, and Lender thereby terminates, any license or other right of the Borrower to collect or receive any Rents, that Lender demands that Borrower direct the tenants under the leases and the guarantors thereof to pay all rents under the leases directly to Lender, that Lender demands that Borrower forward to Lender all rents received by Borrower after the occurrence of the Event of Default that occurred on the Extended Maturity Date, and that Lender demands that Borrower deliver to the Lender all of the tenants' security deposits, including any letters of credit, under the leases.   The Additional Notice of Default further provided that if Borrower failed to cure each Event of Default immediately, enforcement proceedings in accordance with the Loan Documents and applicable law may be instituted against the Property and/or Borrower. A copy of the Additional Notice of Default is annexed hereto as Exhibit 15.

63.     The unpaid principal balance of the Loan continues to bear interest at the Default Rate.

64.     In order to protect its security, Lender may during the pendency of this action pay sums for premiums on policies of insurance, real estate taxes, assessments, water charges, sewer rates, customary operating expenses, and/or other charges or advances for obligations of Borrower affecting the Property.

65.     Lender requests that all sums so paid or advanced for obligations of Borrower, together with interest at the Default Rate set forth in the Loan Documents from the date of such payments or advances, together with Lender's costs and expenses in enforcing the sums secured by the Mortgages, including Lender's reasonable attorneys' fees and expenses, shall be added to Lender's claim and secured by the Mortgages, and be adjudged a valid lien on the Property such that Lender be paid such sums out of the proceeds of the sale of the Property.

66.     Lender hereby requests that, in the event this action proceeds to judgment of foreclosure and sale, the Property or any portion thereof be declared to be sold in one or more parcels according to law and in such order as determined by Lender, in "as is" physical condition, subject to, among other things, the following: (a) any state of facts that an inspection of the Property would reveal; (b) any state of facts that an accurate survey of the Property would reveal; (c) covenants, restrictions, easements, and public utility agreements of record, if any; (d) building and zoning ordinances, and any possible violations thereof; (e) rights of tenants or persons in possession of the Property, if any; (f) any equity of redemption of the United States of America to redeem the Property within 120 days from the date of sale; and (g) prior liens of record, if any.

67.     Each of the above-named defendants has or claims to have or may claim to have some interest in or lien upon the Property or some part thereof, which interest or lien, if any, has accrued subsequent to, and is subject and subordinate to, the lien of Lender's Mortgages.

68.     No other action or proceeding has been commenced or maintained or is now pending at law or otherwise for the foreclosure of the Mortgages or for recovery of the sums evidenced or secured by the Notes, Mortgages, or Loan Documents or any part thereof.

69.     Lender shall not be deemed to have waived, altered, released or changed the election herein before made by reason of any payments or advances made after the date of the commencement of this action.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Foreclosure of the Mortgages)

70.     Lender repeats and realleges each of the allegations set forth in Paragraphs 1 through 69 of the Complaint as if more fully set forth herein.

71.     The Loan Documents constitute valid and enforceable contracts between Lender and Borrower.

72.     Lender, at all relevant times, performed its obligations under the Loan Documents.

73.     Lender is the lawful owner and holder of the Loan Documents and the indebtedness secured thereby.

74.     Borrower's failure, among other things, to pay all outstanding amounts on or before the Extended Maturity Date, to pay the Late Charges, to pay interest at the Default Rate from and after the Extended Maturity Date, and to pay the claims and amounts secured by the mechanic's liens of the Mechanic Lienors each represent a material breach of the Loan Documents, and each constitute an Event of Default under the Loan Documents.

75.     On or about February 5, 2024, Lender sent the February Notice of Default formally advising Borrower that one or more Events of Default had occurred and demanding the full and immediate payment of all outstanding principal, interest, and fees due under the Notes, Mortgages, and other Loan Documents.

76.     On May 10, 2024, Lender sent the Additional Notice of Default providing that the Events Default remained uncured and if Borrower failed to cure each Event of Default immediately, enforcement proceedings in accordance with the Loan Documents and applicable law may be instituted against the Property and/or Borrower.

77.     To date, despite Lender's multiple demands for payment, Borrower has failed to pay the amounts due and owing to Lender under the Loan Documents.

78.     By reason of the foregoing, as of May 1, 2024, and as a result of Borrower's defaults under the Loan Documents, there is due and owing, from Borrower to Lender: (i)

$315,000,000.00 in outstanding principal balance; (ii) accrued and unpaid interest at the rates set forth in the Notes and the Default Rate, as applicable, in the aggregate amount of $7,737,658.34; (iii) Late Charges in the aggregate amount of $53,811.34; (iv) attorneys' fees, costs, and expenses; and (iv) all other sums provided for under the Loan Documents.  Interest of all kinds, fees, costs, and other charges continue to accrue.

79.     Pursuant to the Loan Documents, upon the occurrence and during the continuance of any Event of Default, Lender is permitted to institute a foreclosure proceeding.

80.     By reason of the foregoing, Lender is entitled to a Judgment of Foreclosure and Sale of the Property and application of the proceeds of the sale of the Property to the sums due under the Loan Documents.

## AS AND FOR A SECOND CAUSE OF ACTION
(Foreclosure of the UCC Collateral)

81.     Lender repeats, reiterates and re-alleges each and every allegation set forth in Paragraphs 1 through 80 of the Complaint.

82.     As further security for the Loan, the Term Loan Mortgage includes a security agreement and fixture filing within the meaning of the Uniform Commercial Code, which grants to Lender, as the holder of the Term Loan Mortgage, a security interest in favor Lender with respect to the Term Loan Collateral.

83.     Lender perfected its security interest against the Term Loan Collateral by filing the Term Loan UCC-1, which was filed with the Delaware Secretary of State on August 22, 2011, as control number 20113446054.

84.     Lender continued the effectiveness of the Term Loan UCC-1 through August 22, 2026, by filing with the Delaware Secretary of State the Term Loan UCC-1 Continuations.

85.     As further security for the Loan, the Future Advance Mortgage includes a security agreement and fixture filing within the meaning of the Uniform Commercial Code, which grants to Lender, as the holder of the Future Advance Mortgage, a security interest in favor of Lender with respect to Future Advance Collateral.

86.     Lender perfected a security interest against the Future Advance Collateral by filing the Future Advance UCC-1, which was filed with the Delaware Secretary of State on December 11, 2012, as control number 20124806362.

87.     Lender continued the effectiveness of the Future Advance UCC-1 through December 11, 2027, by filing with the Delaware Secretary of State the Future Advance UCC-1 Continuations.

88.     Accordingly, Lender currently holds a duly perfected security interest in the Collateral as evidenced by the Term Loan UCC-1, Term Loan Continuations, Future Advance UCC-1, and Future Advance Continuations.

89.     Borrower continues to be in default under the Loan Documents, including, but not limited to, the Events of Default set forth above.

90.     Pursuant to Section 9-601(a)(1) of the New York Uniform Commercial Code, Lender has the right to foreclose upon the Collateral sold together with the Property in a single judicial proceeding and public sale.

91.     No person or entity possesses an interest in the Collateral superior to the security interests held by Lender.

### AS AND FOR A THIRD CAUSE OF ACTION
(Recourse Liability Against Borrower)

92.     Lender repeats, reiterates and re-alleges each and every allegation set forth in Paragraphs 1 through 91 of the Complaint.

93.     Pursuant to the Section 11.1(c) of the Loan Agreement, Borrower shall be personally liable to Lender, and Lender shall have full recourse against Borrower in connection with the Loan if and to the extent, among other things, Borrower applies or appropriates any rents received from tenants or other occupants of the Property in violation of the terms of the Loan Documents.

94.     As set forth herein, the occurrence of one or more events set forth in Section 11.1(c) of the Loan Agreement have occurred, irrevocably triggering full recourse against Borrowers pursuant to the Loan Agreement.

95.     Borrower should be adjudged personally liable to Lender in connection with the Loan for the amount of rents and other similar amounts not paid to Lender in accordance with the terms of the Loan Documents.

## AS AND FOR A FOURTH CAUSE OF ACTION
(Appointment of Receiver)

96.     Lender repeats, reiterates and re-alleges each and every allegation set forth in Paragraphs 1 through 95 of the Complaint.

97.     Pursuant to the Mortgages, upon the occurrence of an Event of Default (as defined in the Loan Agreement), Lender may, without notice and without regard to the adequacy of security, apply for the appointment of a receiver of the Property, which appointment Borrower consents to, whether or not a foreclosure sale has occurred.

98.     Borrower's failure, among other things, to pay all outstanding amounts on or before the Extended Maturity Date, to pay the Late Charges, to pay interest at the Default Rate from and after the Extended Maturity Date, and to pay the claims and amounts secured by the mechanic's liens of the Mechanic Lienors each represent an Event of Default under the Loan Documents.

99.     As a result of the Events of Default, Lender is entitled to apply for the appointment of a receiver of the Property during the pendency of this action to (i) receive and collect the earnings, revenues, rents, issues, profits and income from the Property, (ii) take the necessary measures to protect, improve, and remediate the Property in order to protect and safeguard the collateral for the Loan, and (iii) conduct a receiver-led sale of the Property if necessary.

**WHEREFORE**, Lender respectfully requests that the Court enter judgment in favor of Lender for foreclosure of the Property as follows:

(a)     adjudging the entire principal amount of $315,000,000, plus accrued and unpaid interest at the rates set forth in the Notes and the Default Rate, as applicable, in the aggregate amount of $7,737,658.34 plus the amount of interest at the Default Rate accruing from and after May 1, 2024, late charges in the aggregate amount of $53,811.34, attorneys' fees and expenses, other amounts due to Lender under the Loan Documents, and interests, fees, costs, and charges of all kinds that continue to accrue;

(b)     adjudging any taxes, assessments, sewer rates, water meter charges, insurance premiums and other charges affecting the Property, including amounts which may be due for labor and materials furnished by Lender during the pendency of this action to be deemed secured by a security interest and a valid lien on the Property;

(c)     barring and forever foreclosing defendants and all persons claiming by, through or under them, including, without limitation, Mechanic Lienors, subsequent to the commencement of this action of all estate, right, title, lien, claim or equity of

redemption in the Property or to any fixtures, fittings and appliances affixed thereto;

(d)    enjoining Borrower from, among other things, collecting any rents, proceeds or income arising from the Property and mandating that Borrower turn over to Lender all such rents, proceeds, or income arising from the Property that have been collected by Borrower the Event of Default that occurred on the Extended Maturity Date;

(e)    selling the Property and all fixtures, fittings and appliances affixed thereto; bringing the proceeds arising from the sale into Court; and paying to Lender from such proceeds the principal amount due on the Loan Documents plus interest from the dates specified above to the date of payment, late charges due under the Loan Documents, Lender's attorneys' fees, costs and expenses as specified in the Loan Documents, reimbursement for all expenses incurred in obtaining such insurance costs, expenses and disbursements of this action, the expense of sale together with any sums which may have been paid or which may be paid by Lender for taxes, other insurance premiums, water charges, sewer rent and assessments and all sur-charges and advances to be paid on the Property, together with interest thereon from the dates of the respective payments and advances until the date of payment;

(f)    ordering that the referee and/or auctioneer conducting the sale shall be required by the judgment of the sale to specify the amount of any deficiency in the report of sale so that Lender may make the appropriate application for a deficiency judgment pursuant to N.Y. Real Prop. Acts. Law § 1371 or the applicable

provisions of the New York Uniform Commercial Code against any appropriate party;

(g)     adjudging any deficiency that is incurred upon the disposition of the Property referred to herein against any appropriate party;

(h)     entering judgment in the amount of the deficiency in Lender's favor;

(i)     appointing a receiver of the Property during the pendency of this action to (i) receive and collect the earnings, revenues, rents, issues, profits and income from the Property, (ii) take the necessary measures to protect, improve, and remediate the Property in order to protect and safeguard the collateral for the Loan, with the usual powers and duties, (iii) market and sell the Property, and (iv) secure appropriate injunctive relief in connection with the foregoing;

(j)     adjudging Borrower personally liable in connection with the Loan for the amount of rents and other amounts not paid to Lender in accordance with the terms of the Loan Documents;

(k)     awarding Lender such other and further relief as the Court deems just and proper.

Dated: May 17, 2024

Respectfully submitted,

**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**


By:   _/s/ Alan M. Feld_
     Alan M. Feld
     Michael T. Driscoll
     Damani C. Sims
     30 Rockefeller Plaza
     New York, New York 10112
     Tel:  (212) 653-8700
     Fax:  (212) 653-8701
     afeld@sheppardmullin.com
     mdriscoll@sheppardmullin.com
     dsims@sheppardmullin.com

     _Attorneys for Plaintiff Massachusetts Mutual_
     _Life Insurance Company_